## Crowe v. Commonwealth.

(Decided January 21, 1919.)

### Appeal from Kenton Circuit Court.

1. Criminal Law—Evidence.—Evidence examined and held sufficient to support a verdict of guilty.

2. Criminal Law—Evidence.—It was not reversible error for the Commonwealth to call a witness and ask his name, place of residence and the further question, "I will ask you to look at John and Fred Crowe and state if you have ever seen either one of them before," where the objection was sustained and the witness was not permitted to answer.

3. Criminal Law—Evidence.—The mere fact that the Commonwealth's attorney intended to elicit evidence tending to show that the defendant had been guilty of other crimes, did not prejudicially affect the rights of appellant where no such evidence was introduced or allowed by the court.

4. Criminal Law—Argument of Counsel.—While it is reversible error for the prosecuting attorney, in his closing argument, to declare his individual opinion and belief of the guilt of the defendant, not expressly stated to be based upon the evidence, no such error occurred upon the trial of this case where the court admonished the jury that they could consider the evidence of the witnesses only, and the Commonwealth's attorney corrected his statement to "I believe from the testimony" that certain inferences may be drawn.

JOHN B. O'NEAL for appellant.

STEPHEN L. BLAKELY, CHARLES H. MORRIS, Attorney General, and OVERTON S. HOGAN, Assistant Attorney General, for appellee.

Opinion of the Court by Judge Sampson—Affirming.

In June, 1917, John Crowe and Fred Crowe, brothers, were jointly indicted in the Kenton circuit court for the crime of "feloniously breaking and entering in the dwellig house of another, with intent to steal therefrom, and unlawfully and feloniously taking, stealing and carrying away therefrom articles of value." Defendants moved for a severance of trial, and the Commonwealth elected to try John Crowe first. After several continuances and various preliminary motions a jury was empaneled, which after hearing the evidence, instructions of the court and argument of counsel, returned the following verdict: "We, the jury, find the within named, John Crowe, defendant herein, is guilty as charged in this indictment and fix his penalty at five (5) years in the penitentiary." Judgment was entered on the verdict and Crowe prosecutes this appeal.

Appellant urges a reversal of the judgment on three grounds only: (1) the verdict was flagrantly against the evidence; (2) the court permitted the introduction of improper and prejudicial evidence over the objection of appellant; (3) the attorney for the Commonwealth in his closing argument to the jury was guilty of misconduct prejudicial to the rights of the defendant, to which timely objection was made.

The defendants are charged with burglarizing the house of Mrs. Pieper, on Greenup street, in the city of Covington, on the night of March 6th, 1917, and stealing and taking away a set of diamond earrings of the value of $1,000.00; a small diamond pin and a pocket-book containing $39.00 in cash. Mrs. Piper was an invalid. She had living with her three daughters and two sons. Joe Pieper, one of the sons, was sick of pneumonia; the other son, Ed Pieper, was attending to business and was out of the house at the time the burglars entered it; the burglary occurred about 12:20 or 12:30 in the morning; the family was sleeping upstairs; the four bedrooms were all entered from a hall in which a gaslight was kept burning each night; the doors were close together; the sick son was awakened by a noise at his door, and upon looking he saw the door open and a man enter; the gaslight had been turned out; the burglar had a flashlight; when the sick young man inquired who it was, the burglar threw a light in his face and covered him with a pistol,

demanding that he lie down and keep quiet; this he did; about the same time another burglar entered the room with a flashlight and searched the drawers of the dresser and other secret places for valuables. While this was going on one of the daughters in another room, having heard a commotion in her brother's room, came in suddenly and was caught in the arms of one of the burglars, who made her lie down on the floor. In the meantime the first burglar had continued to cover the young man in bed with his pistol and light. One of the other sisters, hearing a noise and observing that the gas light had been extinguished in the hall, arose and relighted the gas. This enabled the sick son to see the features of one of the burglars, whom he afterwards identified as Fred Crowe. The other burglar having entered the room of the mother, required her to keep quiet while he searched the dresser for valuables; and while he was engaged in this, Miss Flora Pieper ran into the room and the burglar, observing she had earrings, required her to lie down while he took the earrings from her ears. This, of course, created more or less commotion, and the other son, Ed Pieper, entering the hall below and hearing a noise in his mother's room, ran up to see what was the matter only to be backed out of the room into the hall by a burglar pointing a light and pistol in his face. He was required to lie down on the floor while the burglar went through his pockets, relieving him of his pocket-book, money and some papers. The burglars were not masked, but were well dressed young men. During the interval between the appearance and departure of the burglars several members of the Pieper family obtained close and plain views of the second burglar, whom they later identified as John Crowe. No member of the Pieper family appears to have known the Crowe boys before the night of the burglary. The burglars made their escape, and while they were doing this, Joe Pieper, the sick man, called the police department and notified them of the occurrence. Some ten days later the defendants were arrested upon the charge.

1. The defense is an alibi. John Crowe claims he did not even know where the Piepers lived; that he was at Germania Hall, in Covington, on the night of the burglary with a party of friends by whom he proves his whereabouts. He says Germania Hall did not close until 12 o'clock that night; that he was in the hall at the time it

closed; that he immediately went with a lady friend to a restaurant where he ordered a lunch and sat for some thirty minutes; thereafter he and the friend walked down to the Covington end of the suspension bridge, which crosses the Ohio river, and waited at the bridge for a party who had promised to meet them, and then walked back to a retaurant which he named, and there loafed a while up until two o'clock in the morning. As the burglary happened about 12:30 o'clock at night, it is the contention of counsel for Crowe that it was a physical impossibility for the accused to have been at the Pieper home, which was at least one mile distant from Germania Hall and the places mentioned.

The Commonwealth contends that the alibi is pure fiction; that the witnesses introduced by appellant to sustain the alibi are mistaken about the night upon which Crowe was at Germania Hall and walked down to the bridge and other places about which he testified. To sustain the charge in the indictment the Commonwealth introduced Ed Pieper, from whom the pocket-book and money were taken, his sisters, Flora Pieper and Agnes Pieper, all of whom positively identified John Crowe as the man who entered their room on the night in question and took the diamond earrings and money. Joe Pieper was also introduced, who testified concerning the burglary and the appearance of the burglars, and who identified Fred Crowe, the brother of John, as one of the men. Fred Crowe was also shown to have been at Germania Hall at the same time John claims to have been there. While there are a number of witnesses who testified to facts in corroboration of John Crowe and in support of his alibi, some of them are very questionable characters, others good people. The evidence for the Commonwealth is direct, certain and convincing, and leaves no doubt that John Crowe was one of the burglars who entered the house on the night in question. The jury was the judge of the facts and was thoroughly justified, under the evidence, in returning a verdict of guilty.

2. It is next complained that improper and prejudicial evidence was introduced by the Commonwealth, over the objection of the defendant. This objection is based upon the Commonwealth's attorney calling Margaret Koch and her father, Rufus Koch, who were asked the following questions: "Q. Please state your name? A. Margaret Koch. Q. Where do you live? A. At the

southeast corner of Pleasant and Greenup streets, Covington, Kentucky. Q. How long have you lived there? A. Eight years in April. Q. Does your father live there? A. Yes, sir. Q. I will ask you to look at John and Fred ,Crowe, and state if you have ever seen either one of them before? (Objection by defendant; objection sustained; Commonwealth avows.)''

These, in substance, were the only questions propounded to either of the witnesses; they gave no other evidence. The questions asked them and the answers which they gave might properly have been asked and received from any other witness introduced on either side without prejudicial error. But the attorney for appellants urges that the Commonwealth's attorney had some ulterior motive in his mind and was attempting to and intending to elicit answers from the witnesses, which would have been incompetent. It is insisted that the attorney for the Commonwealth was endeavoring to get before the jury evidence of other crimes committed by the defendant; that appellant's character was not good; that this, in some unknown and mysterious manner, was communicated to the jury and had a prejudicial effect upon the rights of the defendant at the trial. From the avowals we are convinced that the evidence which the attorney for the Commonwealth intended to introduce by the witnesses would have been incompetent upon the trial. Nevertheless, we are quite unable to see in what way the rights of defendant were prejudiced by the asking of such innocent questions as quoted above. We are not to presume that the jury was influenced in its verdict by the questions alone, nor that the Commonwealth's attorney or the trial judge entertained sinister motives in offering and allowing the witnesses to appear. While it would not have been competent for the Commonwealth to have introduced evidence of other crimes by the defendant, the calling of a witness and propounding questions concerning his name, residence, etc., followed by the question: ''Have you ever seen either of the defendants before?'' could not have indicated to the jury, or to others, that the witness had upon a former occasion seen the defendant committing another crime. Several very similar questions were propounded to other witnesses upon the trial, to which no objection was made, or could reasonably have been made. Occult power alone on the part of the jury could have transmitted to them knowledge of the

fact that the Commonwealth's attorney desired to prove the commission of other crimes. We are of opinion that the trial court properly sustained the objection to the questions and excluded the evidence, but we cannot agree with counsel for appellant that the evidence heard was prejudicial to the rights of the defendant.

3. The argument made by Commonwealth's attorney of which complaint is made is largely copied in the record. This court has held it reversible error for the prosecuting attorney in argument before the jury to declare his individual opinion or belief of the guilt of the defendant, not expressly stated, to be based upon the evidence. Howard v. Commonwealth, 110 Ky. 356. The first statement made by the prosecuting attorney of which complaint is made is, "I believe that this robbery was deliberately planned by Fred Crowe and John Crowe." To this statement objection was made, and the court said to counsel and the jury, "The court states to the jury that the attorney for the Commonwealth may draw any reasonable inference from the testimony." The Commonwealth's attorney then proceeded: "As just stated, I believe from the testimony that the inference may be drawn that John Crowe and Fred Crowe deliberately planned that robbery and deliberately planned and manufactured this alibi at the same time." To this statement counsel for defendant also objected, and the court again said to the jury: "Gentlemen of the jury, you will be governed by the testimony of the witnesses on the witness stand under oath in reaching your verdict; you will reach that verdict solely from the sworn statements of the witnesses, and not from the statements of counsel on either side." The Commonwealth's attorney then proceeded, saying: "Now, gentlemen of the jury, it is rather difficult for me to proceed, as Mr. O'Neal wants to take up my time, but I want you to bear with me while I pick it up again. I say these things to be true upon the testimony of the witnesses. Mr. O'Neal has been trying to testify a good deal in this case. As you know, the only testimony you can consider is the testimony of the witnesses, under oath." We are of opinion that the admonition of the court, as well as the correction made by the Commonwealth's attorney, fully cured any error, if any there was, made by the first statement above quoted from the argument. There could have been no doubt left in the minds of the jury as to their right to consider the statements of the

attorney for the Commonwealth, except those based upon the testimony of the witnesses. In discussing the evidence it was not improper for the Commonwealth's attorney to draw inferences therefrom, and it was natural, we think, in arguing this case, from the evidence to the jury, to declare that the alibi was a fabrication. Unless it was a fabrication, the positive identification made by the three Pieper witnesses was false and untrue. The theory of the defendant and that of the Commonwealth is so utterly irreconcilable that the jury was compelled to accept the evidence of one and reject that of the other. It was in the province of the jury to consider the credibility of the witnesses and accept the rational, reasonable view only and return a verdict in accordance with the facts. No complaint is made of the instructions submitting the case to the jury. There being a controverted question of fact properly submitted to the jury, its verdict thereon will not be disturbed unless it be palpably against the evidence, which is not true in this case.

The judgment is affirmed.